Scott A. Lucas
Law Offices of Scott A. Lucas
250 Park Avenue
20th Floor
New York, New York 10177
(212) 983-6000
*Attorneys for Plaintiff Hyunmi Son*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
HYUNMI SON,

                          Plaintiff,

         -against-

REINA BIJOUX, INC., BIJOUX WORLD,
INC., JIEUN YOUN, INHEE PARK
and SUNG MIN KIM,

                  Defendant.
-----------------------------------------------------X

11-cv-2315 (SAS)

**AMENDED
COMPLAINT**

         Plaintiff Hyunmi Son, by her attorneys, the Law Offices of Scott A. Lucas, alleges as follows for her Amended Complaint against Defendants Reina Bijoux, Inc., Bijoux World, Inc., Jieun Youn, Inhee Park and Sung Min Kim (collectively, "Defendants"):

## **<u>INTRODUCTION</u>**

         1.      This case is about an employer that required its Korean employees to work overtime without paying them for it because of the alleged willingness of Koreans to do such additional work as a "courtesy" to the employer.

2.     Plaintiff is a Korean-born U.S. resident who complained about this illegal and immoral practice and was promptly fired for doing so.

3.     Plaintiff brings this action against Defendants Reina Bijoux, Inc., Bijoux World, Inc., Jieun Youn, Inhee Park and Sung Min Kim for unlawful discrimination and retaliation in violation of 42 U.S.C. § 1981, New York City Human Rights Law § 8-107, *et seq.*, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3), and New York Labor Law § 215, and for unpaid overtime and liquidated damages under the FLSA, 29 U.S.C. § 201, *et seq.*

## JURISDICTION & VENUE

4.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§1331 and 1337, 42 U.S.C. § 1981 and 29 U.S.C. § 216(b).

5.     This Court has supplemental jurisdiction over Plaintiff's claims under state and local law pursuant to 28 U.S.C. § 1367.

6.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c).

## THE PARTIES

7.     Plaintiff Hyunmi Son is a resident of the State of New York and County of New York, residing at 211 E. 51st St., Apt. 3C, New York, NY 10022.

2

8.     Upon information and belief, Defendants Reina Bijoux, Inc. and Bijoux World, Inc. are New York corporations organized under the laws of the State of New York with their principal place of business located at 1239 Broadway, Suite 1400, New York, NY 10001.

9.     Defendant Jieun Youn (whose nickname is "Brenda") is an individual who, upon information and belief, resides in the State, City and County of New York.

10.     Defendant Inhee Park is an individual whose current residence is not known to Plaintiff.

11.     Defendant Sung Min Kim (whose nickname is "Tony") is an individual whose current residence is not known to Plaintiff.

12.     A copy of the Complaint will be served on the New York City Commission on Human Rights, the Corporation Counsel's office and the New York Attorney General's office at or about the time Defendants are served.

**Defendants' Status As Joint Employers**

13.     At all material times herein, Defendants were operating a business under the name Bijoux World, Inc. and Reina Bijoux, Inc. (collectively, the "Company").

14.     The principal business of the Company is the ownership, operation, management and marketing of imported costume jewelry.

3

15.     Bijoux World, Inc. and Reina Bijoux, Inc. appear as either the same entity, or as entities that are indistinguishable from one another, on a website (www.bijouxworld.net) which, upon information and belief, was established by and is controlled by Defendants.

16.     Upon information and belief, at the age of 26 Jieun Youn was appointed by her mother, Inhee Park, to run the day-to-day affairs of the Company.

17.     Upon information and belief, Jieun Youn is and was, at all material times herein, an owner of the Company.

18.     Upon information and belief, Jieun Youn is and was, at all material times herein, the Secretary and Manager of the Company.

19.     Upon information and belief, at all material times herein Jieun Youn exercised significant managerial control over the Company's employees, including, without limitation, assigning work, determining compensation, imposing discipline, hiring and firing, formulating business and marketing strategy, and, upon information and belief, maintaining employment and compensation records.

20.     Upon information and belief, at all material times herein Jieun Youn had the power to determine and/or change the Company's hiring decisions, work schedules, work assignments and employee compensations practices.

4

21.     Jieun Youn also condoned, acquiesced in, cooperated with and facilitated Defendants' practice of assigning Korean employees overtime but not paying them for the extra work.

22.     Upon information and belief, at all material times herein Jieun Youn was an agent of the Company, and, in doing the things alleged in this Complaint, was acting within the course and scope of such agency.

23.     Upon information and belief, Inhee Park is also known by the first name "Sofia" and the last name "Youn".

24.     Upon information and belief, Inhee Park is and was, at all material times herein, an owner of the Company.

25.     Upon information and belief, Inhee Park is and was, at all material times herein, an officer of the Company.

26.     Upon information and belief, Inhee Park has, and at all material times herein had, an office and a desk at the Company.

27.     Inhee Park directed Plaintiff to transmit daily financial statements about the Company to her and to her daughter, Jieun Youn, and Plaintiff complied with this directive.

28.     Upon information and belief, at all material times herein Inhee Park directly and indirectly exercised significant managerial control over the Company's employees, including, without limitation, assigning work (including

assigning Plaintiff the task of handling large cash deposits from customers of Inhee Park's Chinese company, which served as agent of Reina Bijoux, Inc. and Bijoux World, Inc.), formulating business and marketing strategy, determining compensation, imposing discipline, hiring and firing, and, upon information and belief, maintaining employment and compensation records.

29.    Upon information and belief, at all material times herein Inhee Park had the power to determine and/or change the Company's hiring decisions, work schedules, work assignments and employee compensations practices.

30.    Upon information and belief, Inhee Park also condoned, acquiesced in, cooperated with and facilitated Defendants' practice of assigning Korean employees overtime but not paying them for the extra work.

31.    Upon information and belief, at all material times herein Inhee Park was an agent of the Company, and, in doing the things alleged in this Complaint, was acting within the course and scope of such agency.

32.    Upon information and belief, Sung Min Kim is and was, at all material times herein, Manager of the Company.

33.    Upon information and belief, at all material times herein Sung Min Kim directly and indirectly exercised significant managerial control over the Company's employees, including, without limitation, assigning work, determining

6

compensation, imposing discipline, and, upon information and belief, maintaining employment and compensation records.

34.     Upon information and belief, at all material times herein Sung Min Kim had the power to influence, determine and/or change the Company's hiring decisions, work schedules, work assignments and employee compensations practices.

35.     Upon information and belief, Sung Min Kim also condoned, acquiesced in, cooperated with and facilitated Defendants' practice of assigning Korean employees overtime but not paying them for the extra work.

36.     Upon information and belief, at all material times herein Sung Min Kim was an agent of the Company, and, in doing the things alleged in this Complaint, was acting within the course and scope of such agency.

37.     Upon information and belief, Reina Bijoux, Inc. and Bijoux World, Inc. commingled their bank deposits.

38.     Upon information and belief, at all material times herein Defendants were joint employers of Plaintiff.


**Defendants' Employment of Plaintiff**

39.     Inhee Park hired Plaintiff, a Korean-born person who is a lawful resident of the United States, to work for the Company as a book-keeper

7

and in-house bill collector commencing August 23, 2010.

40.    Plaintiff's` agreed-upon compensation arrangement with Defendants was for Plaintiff to work an ostensible 40-hour work week in exchange for $400 per week or $10 per hour, a rate that changed to $500 per week or $12.50 per hour in October 2010.

41.    Despite the ostensible 40-hour work week, Plaintiff worked substantial overtime.

42.    The amount of overtime worked by Plaintiff varied somewhat from week to week, but averaged about 12.5 hours per week.

43.    Plaintiff was never compensated for any of her overtime work.

44.    There was never any agreement between Plaintiff and Defendants to compensate Plaintiff for overtime work.

45.    Plaintiff's work was closely supervised by Defendants.

46.    Plaintiff had very little autonomy or discretion in performing her duties.

47.    Plaintiff never supervised anyone.

48.    Plaintiff was not an exempt employee.


**Defendants' Practice of Exploiting Koreans**

49.    Upon information and belief, Defendants' principals (including

Jieun Youn and Inhee Park) are Korean-born residents of the United States whose native language is Korean.

50.     Unbeknownst to Plaintiff at the time she was hired, Defendants set working conditions for employees based, in part, on the race of the employee, and did so to evade the wage and hour laws.

51.     Specifically, Defendants assigned overtime work disproportionately to employees whose race is Korean because – according to Defendants – Koreans do what they are told without asking for overtime.

52.     Defendants were so comfortable exploiting Koreans in this fashion that they required their Korean employees to work overtime without compensation even more often than they required their Hispanic employees who are here illegally (another exploited group) to work overtime without compensation.

53.     Periodic comments or inquiries by Plaintiff about the absence of overtime pay were met with statements from Sung Min Kim and Jieun Youn to the effect that "We don't pay overtime in this industry."

54.     On January 25, 2011, Manager Sung Min Kim informed Plaintiff (who was already working about 12.5 hours of weekly overtime without getting paid for it) that going forward she would also have to work Saturdays without getting paid for it.

9

55.     Plaintiff protested that it was unfair for her to have to work without being paid, and Sung Min Kim told her she would not be allowed to work if she insisted on being paid for the extra work.  Sung Min Kim added, in words or substance, that even though overtime may be paid by other employers, the non-payment of overtime is something Koreans understand and accept.

56.     Plaintiff was shocked and distraught that Defendants would say such a thing, and that they would single out their own fellow Koreans for non-payment of overtime.

57.     At the suggestion of her husband, a police sergeant, Plaintiff went back the next day to speak separately to the Manager and to the owner and General Manager, and to use her IPhone to record their conversation with her on the subject.

58.     The recording of Plaintiff's conversation with the Manager and her conversation moments later with owner and General Manager (Jieun Youn) and the Manager (Sung Min Kim) was thereafter translated from Korean to English and transcribed by an independent certified translation service.

59.     Plaintiff's January 26, 2011 conversation with Manager Sung Min Kim about why Plaintiff was being required to work on Saturdays without pay includes the following verbal exchange, according to the independent certified translation of their conversation:

10

| | |
|---|---|
| **Plaintiff:** | Even restaurants pay overtime. |
| **Manager:** | I have seen many cases like this to tell you the truth…that is why we work with Koreans. Koreans… |
| **Plaintiff:** | Don't they complain even if they don't get paid overtime? |
| **Manager:** | Koreans understand each about this kind of courtesy (incomprehensible) |

See Ex. "A" (certified translation and transcription of ASTA-USA Translation Services, Inc.) (emphasis supplied).

60.     Towards the end of her conversation with Manager Sung Min Kim, Plaintiff asked to speak to General Manager Jieun Youn.

61.     Moments later Plaintiff and Jieun Youn had a conversation about why Plaintiff was being required to work on Saturdays without getting paid. During that conversation Jieun Youn drew a distinction between wanting to do extra work without getting paid, and a willingness to do so, which Plaintiff was expected to demonstrate.

62.     That conversation included the following verbal exchange according to the independent certified translation of the conversation:

| | |
|---|---|
| **Jieun Youn:** | *** Not everyone wants to work on Saturdays. I understand you said no when the company said you should… |
| **Plaintiff:** | Yes, that is because I was told there was no overtime pay. Is that true? |

11

**Jieun Youn:**  <u>Yes, no one</u>.

**Plaintiff:**  Why not?

**Jieun Youn:**  Um~

**Plaintiff:**  Is it because we get paid weekly?

**Jieun Youn:**  Uh?

**Plaintiff:**  Is it because we get paid weekly?

**Jieun Youn:**  If you clearly say it is overtime in the U.S. style, then the company would be a U.S. company. But we Korean company does not really…

**Plaintiff:**  But this company is located in the U.S…To be honest with you. To make it clear, this company is located in the U.S. This company, though not a U.S. company, must follow U.S. law. You see, even restaurants pay overtime. It is fine with me if you don't pay. But it kind of bothers me when the company refuses to provide the very basics.

**Jieun Youn:**  <u>That is why we hire Koreans</u>. When we conduct interviews…you did not have an interview with me. We tell everybody at the interview.

**Plaintiff:**  The company does not pay overtime?

**Jieun Youn:**  No, on Saturdays…regular hours are Monday through Friday, but when busy, employees should come to work to prepare a show. <u>There is no additional pay</u>. We tell them about it…

**Plaintiff:**  So, I am being fired because I work Monday through Friday but not on Saturday (strained laugh)

**Jieun Youn:**  (Strained laugh)

12

**Plaintiff:**       Is there another reason other than that? The reason
                     I am being fired?

(silence)

See Ex. "A" (certified translation and transcription of ASTA-USA Translation

Services, Inc.) (emphasis supplied).

63.    To the limited extent the full nuance of limited portions of the

conversations were not fully captured by the certified transcriptionist due to voice

inflection, moments of limited audibility, or otherwise, the statements by Manager

Kim and General Manager Jieun were, if anything, even more damning than the

verbal exchange set forth by the official transcriptionist.

64.    After Plaintiff was informed that she was being terminated,

Defendant Jieun Youn rejected Plaintiff's offer to work through the end of the

week and told Plaintiff that she had to leave that day (i.e., January 26, 2011).

65.    Accordingly, January 26, 2011 was Plaintiff's last day of

employment.

## FIRST CAUSE OF ACTION

## VIOLATIONS OF 42 USC § 1981

66.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 -

65 as if set forth herein.  [The paragraphs in this cause of action are included in the

Amended Complaint for ease of reference and to avoid undue confusion, *i.e.*, to avoid the confusion that might result if Plaintiff's other claims were all re-numbered, and because the averments of this cause of action are incorporated by reference into Plaintiff's cause of action for violating the New York City Human Rights Law, the viability of which has not been challenged.]

67.    Plaintiff is a member of the Korean race.

68.    Defendants' racially discriminatory conduct as aforesaid deprived Plaintiff of an equal right to the making, performance, modification, and termination of her at will employment contract, and to the benefits, privileges, terms, and conditions of said contractual relationship.

69.    As the persons who engaged in and/or authorized such conduct, Defendants, individually and as Plaintiff's joint employer, are liable under 42 U.S.C. § 1981 for their actionable conduct.

70.    As a result of Defendants' unlawful discriminatory conduct as aforesaid, Plaintiff, whose facility with the English language is limited, and who regularly conversed with her employers in Korean, lost her job, her job-related income and any chance of advancement within the company.  In all likelihood, Plaintiff will be unable to find employment in the most likely source of employment for her, namely, the tight-knit community of Korean businesses which are located in the same neighborhood as the Company.

71.     As a result of Defendants' unlawful discriminatory conduct as aforesaid, Plaintiff also experienced intimidation, diminished self-esteem, fear, humiliation, embarrassment, degradation, anxiety and feelings of anger, sadness and stress comparable to what another person in Plaintiff's position would be expected to experience under the circumstances described herein.

72.     As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but which is estimated to be not less than $1 million.

73.     In addition, in light of the willful, wanton and reckless nature of Defendants' conduct as aforesaid, and the substantial public interest threatened by Defendants' systematic discrimination against Koreans, punitive damages should be imposed in an amount not less than $1 million, or such other amount as is sufficient to punish them and to deter similar misconduct by Defendants and other employers.

## SECOND CAUSE OF ACTION

### VIOLATIONS OF NEW YORK CITY
### HUMAN RIGHTS LAW ("NYCHRL") § 8-107, *et seq.*

74.     Plaintiff incorporates paragraphs 1 - 73 by reference as if fully set forth herein.

75.     Defendants have, and have had at all material times herein, at least four persons in their employ.

76.     At all times during her employment with Defendants, Plaintiff was an "employee" as that term is used in the New York City Human Rights Law.

77.     On information and belief, Defendants are and were at all material times herein:  **(A)** "person[s]" under NYCHRL § 8-102(5); **(B)** "employer[s]" under NYCHRL § 8-102(1); **(C)** "covered entit[ies]" under NYCHRL § 8-102(17); **(D)** "agent[s]" under NYCHRL § 8-107(1); and **(E)** "aid[ors]" and "abet[tors]" under NYCHRL § 8-107(6).

78.     The Local Civil Rights Restoration Act of 2005 (LCRRA), enacted by the City Council to clarify the scope of NYCHRL, amended New York City Administrative Code § 8–130 to read:  "The provisions of [the NYCHRL] shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed."

79.     NYCHRL § 8-107, *et seq.* makes it unlawful for any employer or an employee or agent thereof, because of race or national origin to discriminate against an employee in the terms, conditions or privileges of employment.

80.     NYCHRL § 8-107(7) further provides that "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter…"

81.     Despite Plaintiff's unblemished work history during the time she was employed by Defendants, Defendants came to view Plaintiff negatively due to her unwillingness to conform to Defendants' stereotypes about Koreans and their actual or alleged willingness to provide their employers the "courtesy" of additional work without being paid.

82.     Defendants subjected Plaintiff to racial (or, in the alternative, national origin) discrimination and admittedly terminated Plaintiffs' employment for her refusal to conform to Defendants' stereotypes regarding Koreans, who, according to Defendants, are expected to perform additional work *without pay* as a "courtesy" to their employer.

83.     Upon hearing Plaintiff's complaints that Koreans be given the same overtime pay to which other employees are entitled by law, Defendants did not apologize to Plaintiff.  Nor did they take any steps to remedy the Company's discriminatory pay policy.  Instead, they retaliated by terminating Plaintiff's employment.

84.     For the sake of avoiding any possible misreading of this Complaint, Plaintiff does not, and never has, complained of merely being required to work overtime.  Rather, she has complained about Koreans being singled out to perform *unpaid* overtime due to Defendant's racial and/or national original stereotypes that Koreans perform such *unpaid* work as a courtesy to their employer.  Such conduct is clearly unlawful.

85.     The retaliatory and discriminatory acts complained of herein were reasonably likely to deter a person from engaging in protected activity.

86.     As a result of Defendants' discriminatory and retaliatory conduct, Plaintiff has also experienced fear, humiliation, embarrassment, anxiety and feelings of anger, sadness and stress comparable to what another person in her position would be expected to experience under the circumstances described herein.

87.     As the foregoing conduct violated NYCHRL § 8-107, *et seq.*, Defendants are liable to Plaintiff for compensatory damages in an amount to be determined at trial, but which is estimated to be not less than $1,000,000, together with statutorily authorized attorney's fees and punitive damages in an amount not less than $1,000,000 in light of Defendant's egregious policy of discriminating against employees whose race (and, in the alternative, national origin) is Korean. (NYCHRL § 8-502)

18

## THIRD CAUSE OF ACTION

## UNLAWFUL RETALIATION
## IN VIOLATION OF THE FLSA

88.     Plaintiff incorporates paragraphs 1 - 87 by reference as if set forth herein.  [The paragraphs in this cause of action are included in the Amended Complaint for ease of reference and to avoid undue confusion, *i.e.*, to avoid the confusion that might result if Plaintiff's other claims were all re-numbered, and because the averments of this cause of action are incorporated by reference into Plaintiff's cause of action for violating the New York City Human Rights Law, the viability of which has not been challenged.]

89.     The FLSA contains an anti-retaliation provision that forbids employers  "to discharge or in any other manner discriminate against any employee because such employee has <u>filed any complaint</u> ... related to [the FLSA], or has testified or is about to testify in such proceeding..." 29 U.S.C. § 215(a)(3) (emphasis added).

90.     As used in the statute, the phrase "filed any complaint" includes verbal complaints to employers about wage and hour violations.  *Kasten v. Saint-Gobain Performance Plastics Corp.*, --- S.Ct. ----, 2011 WL 977061 (U.S. March 22, 2011).

91.     Plaintiff verbally complained to her employer (i.e., to both the

Manager, Sung Min Kim, and the owner and General Manager, Jieun Youn) about having to work overtime without being paid for it – a requirement Defendants imposed on Plaintiff because she is Korean.

92.    Plaintiff was terminated in retaliation for her insistence that Defendants pay her overtime as required by law.

93.    For violating the FLSA's anti-retaliation provision (29 U.S.C. § 215(a)(3)), Defendants are liable for such relief as may be appropriate to effectuate the purposes of § 215(a)(3), including the payment of wages lost and an additional equal amount as liquidated damages, and punitive damages in the amount not less than $1 million to punish Defendants and deter them and other employers from retaliating against employees who complain about their employer's refusal to pay earned wages.

94.    As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but which is estimated to be not less than $1 million.

95.    Since punitive damages are available for intentional torts such as retaliatory discharge, punitive damages are likewise appropriate under statutes penalizing retaliatory discharge. *Perez v. Jasper Trading, Inc.*, 2007 WL 4441062 (E.D.N.Y. 2007) (citations omitted).

96.     In light of the willful, wanton and reckless nature of Defendants' conduct as aforesaid, and the substantial public interest in deterring and punishing such reprehensible conduct, punitive damages should be imposed against Defendants in an amount estimated to be not less than $1,000,000, and which in any event should be sufficient to punish Defendants and to deter Defendants and other employers from engaging in similar misconduct in the future.

## FOURTH CAUSE OF ACTION

### RETALIATORY DISCHARGE IN VIOLATION OF THE NEW YORK LABOR LAW § 215

97.     Plaintiff incorporates paragraphs 1 - 96 by reference as if fully set forth herein.

98.     This cause of action is expressly pleaded in the alternative, and only then to the extent it is not inconsistent with the other remedies sought elsewhere in this Complaint.

99.     NYLL § 215 makes it unlawful for any employer to discharge, penalize, or in any other manner discriminate or retaliate against any employee because such employee has made a complaint to her employer that the employer has violated any provision of the New York Labor Law.

100.   At all material times herein, Defendants were "employers" of Plaintiff and Plaintiff was an "employee" of Defendants.

21

101.   Defendants fired Plaintiff for complaining about Defendant's unlawful requirement that Koreans perform extra work as a "courtesy" without being paid overtime (a practice that violates, *inter alia*, New York Labor Law §§ 653 and 655, which authorized the Commissioner of the New York Department of Labor to promulgate the overtime pay requirements contained in the Miscellaneous Wage Order codified at section 142.2.2 of Title 12 of New York's Codes Rules and Regulations and New York Labor Law § 663, which authorizes the civil actions to enforce those overtime provisions).

102.   As a result of Defendants' retaliatory conduct, Plaintiff has been, and is likely to continue to be, damaged by loss of income in an amount which is not presently known, but which will be determined at trial.

103.   As a result of Defendants' retaliatory conduct, Plaintiff has also experienced fear, humiliation, embarrassment, anxiety and feelings of anger, sadness and stress comparable to what another person in her position would be expected to experience under the circumstances described herein.

104.   As the foregoing conduct violated NYLL § 215, Defendants are liable to Plaintiff for payment of compensatory damages in an amount to be determined at trial, but which is estimated to be not less than $1,000,000, together with reasonable attorneys fees.

105.   Since punitive damages are available for intentional torts such as retaliatory discharge, punitive damages are likewise appropriate under statutes penalizing retaliatory discharge. *Perez v. Jasper Trading, Inc.*, 2007 WL 4441062 (E.D.N.Y. 2007) (citations omitted).

106.   In light of the willful, wanton and reckless nature of Defendants' conduct as aforesaid, and the substantial public interest in deterring and punishing such reprehensible conduct, punitive damages should be imposed against Defendants in an amount estimated to be not less than $1,000,000, and which in any event should be sufficient to punish Defendants and to deter Defendants and other employers from engaging in similar misconduct in the future.

## FIFTH CAUSE OF ACTION

## UNPAID OVERTIME IN VIOLATION OF THE FLSA

107.   Plaintiff incorporates paragraphs 1 - 106 by reference as if fully set forth herein.

108.   Upon information and belief, Defendants constitute an "enterprise" as that term is defined by 29 U.S.C. § 203(r), in that, at all material times herein, they engaged in the above-referenced related activities (including, without limitation, the ownership, operation, management and marketing of imported costume jewelry) performed through unified operation and/or common

23

control for a common business purpose (i.e., to make money).

109.   At all times mentioned herein, Defendants' employees regularly engaged in interstate commerce in connection with their employment, including, but not limited to:  (a) interstate purchases, sales and marketing of costume jewelry and other goods and materials; (b) handling transactions that involve the interstate banking, finance and insurance systems; and (c) transacting business across state lines via interstate telephone calls, emails, faxes, courier deliveries, and the U.S. Mail.

110.   At all times mentioned herein, Defendants employed employees in and about their business premises in handling, selling, or otherwise working on goods and materials, including, but not limited to, jewels, office supplies, documents, electronic files and other materials which had moved in or been produced for commerce by other persons.

111.   All times mentioned herein the annual dollar volume of business of Defendants was $500,000 or more, and Defendants had at least two employees engaged in commerce.

112.   At all times mentioned herein, Defendants failed to comply with the FLSA, in that Defendants frequently required and permitted Plaintiff to work more than 40 hours per week, but provision was not made by Defendants to pay Plaintiff at the rate of one and one-half times the regular rate for the hours

24

worked in excess of the hours provided for in the FLSA (29 U.S.C. § 207).

113.   Plaintiff worked an average of about 52.5 hours per week during her employment with Defendants, but was paid for no more than 40 hours per week.

114.   Defendants are and were at all relevant times herein aware that overtime pay is mandatory for non-exempt employees who work more than 40 hours per week.

115.   Upon information and belief, Defendants are and were at all material times herein fully aware that Plaintiff usually worked more than 40 hours per week without receiving overtime compensation for any of that additional work.

116.   No agreement existed between the parties with respect to the payment of overtime for hours worked in excess of 40 in a workweek.

117.   Accordingly, Defendants are liable for unpaid overtime and liquidated damages estimated to be not less than $13,000, together with attorney's fees.

## SIXTH CAUSE OF ACTION
(Against Defendants Reina Bijoux, Inc.,
Bijoux World, Inc., Jieun Youn and Inhee Park)

### UNLAWFUL RETALIATION
### IN VIOLATION OF THE FLSA

118.   Plaintiff incorporates paragraphs 1 - 117 by reference as if set forth herein.

119.   After being fired for protesting Defendants' practice of singling out Koreans to perform *uncompensated* overtime work, Plaintiff filed the Complaint in this action in federal for relief under the FLSA and seeking unpaid overtime and damages for Defendant's unlawful retaliation.

120.   In response to said Complaint, Defendant Reina Bijoux, Inc. filed a series of false and baseless Counterclaims.  The Counterclaims accuse Plaintiff of industrial espionage and theft, claiming that Plaintiff is responsible for unnamed competitors learning about Defendant's product availability and pricing.

121.   Upon information and belief, the baseless and retaliatory Counterclaims could not have been filed without the knowledge and approval of Defendant's owners and operators, Jieun Youn and Inhee Park.  (Defendant Sung Min Kim is not named as a defendant with respect to this Cause of Action because, upon information and belief, he no longer works for Defendant and is therefore unlikely to have been involved in Defendants' decision to file the retaliatory Counterclaims.)

26

122.   Where, as here, an employer files baseless counterclaims designed to deter an employee from pursuing his or her FLSA claims, the employer violates the FLSA's anti-retaliation provision, 29 U.S.C. § 215(a)(3). *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 472 (S.D.N.Y. 2008) (citing cases).

123.   Defendant's baseless and retaliatory Counterclaims do not say when the alleged violations occurred, how they occurred, where they occurred, or why they occurred (as Plaintiff does not work for any competitor of Defendants, and is still unemployed).  Nor do they allege what confidential information was compromised, who utilized it, how they utilized it, when they utilized it, or how their alleged utilization of such unidentified confidential information could have harmed Defendant.  And, most important, they fail to identify a single person or entity who ever received any confidential information from anyone.

124.   In addition, while true victims of industrial espionage are quick to seek a temporary restraining order or preliminary injunction, Defendant never did so, and *never even sent Plaintiff a cease and desist letter* – this, despite the fact that the Counterclaims allude exclusively to conduct that Defendant is apparently alleging occurred before Plaintiff's Complaint was ever filed.

125.   Upon information and belief, prior to the filing of Plaintiff's Complaint Defendant had no intention of suing Plaintiff.

27

126.   Defendant's Counterclaims also allude to purported conduct (the alleged "conversion" of $300 in cash) that allegedly occurred well before Plaintiff's employment was terminated, and for which Plaintiff was never even criticized, much less threatened with legal action.

127.   The retaliatory inference is strengthened even more by Defendant's negative reference to, and willful mischaracterization of, Plaintiff's decision to record the overtly discriminatory and retaliatory statements of Defendants Youn and Kim set forth in the annexed transcript.

128.   Specifically, while that recording was obviously made to acquire proof of unlawful conduct, and is therefore protected as a matter of law, *Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989); *EEOC v. Kallir, Philips, Ross, Inc.,* 401 F.Supp. 66 (S.D.N.Y.1975) (Weinfeld, J.), *aff'd,* 559 F.2d 1203 (2d Cir.); *Gallegos v. Elite Model Mgmt. Corp.*, 1 Misc. 3d 907(A), 781 N.Y.S.2d 624 (Sup. Ct. 2004), *aff'd as modified*, 28 A.D.3d 50, 807 N.Y.S.2d 44 (2005), Defendants, in their baseless Counterclaims, have recast that legally protected activity as somehow being part of a "campaign" of industrial espionage. (Counterclaims at ¶¶ 26-27).

129.   Defendants' retaliatory motive is also evident by Defendants' attempt to retroactively elevate Plaintiff's role in the Company -- from that of a recent immigrant working as a book-keeper/bill collector who needed permission

to even disburse funds for a routine lunch expense -- to that of a so-called "Accounting Department Manager".

130.   In addition, Plaintiff was never provided with, and never had occasion to learn, any password for Defendant's website.

131.   Moreover, Defendant does not allege that Plaintiff ever learned – or would have ever or had occasion to learn, in the course of her duties or otherwise – the password for Defendant's website.

132.   Accordingly, besides the fact that Defendant's First Counterclaim is patently speculative and conclusory at best, there is no logical nexus between any trust Defendant may have reposed in Plaintiff, on the one hand, and the harm Defendant claims occurred, on the other.

133.   Furthermore, Defendant does not even allege that Plaintiff went to work for a competitor.

134.   Defendant's false, baseless and malicious Counterclaims were clearly filed in retaliation for Plaintiff's filing of her Complaint challenging Defendant's unlawful conduct, and, as such, are barred as a matter of law.

135.   Defendants' retaliatory conduct as aforesaid is likely to deter a person from engaging in protected activity.

136.   As a result of Defendant's retaliatory Counterclaims accusing Plaintiff of immoral and illegal behavior and demanding punitive damages against

29

Plaintiff, Plaintiff has suffered harm to her reputation (business and personal) in, *inter alia*, the relatively tight-knit Korean-American community in Manhattan, and has experienced stress, intimidation, anxiety and physical and emotional discomfort, and will incur legal costs as well as needless delay in vindicating her legal rights.

137.   For violating the FLSA's anti-retaliation provision (29 U.S.C. § 215(a)(3)), Defendants are liable for such relief as may be appropriate to effectuate the purposes of § 215(a)(3), including, without limitation, damages for diminished employment prospects, non-pecuniary damages and attorney's fees.

138.   As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

139.   Since punitive damages are available for intentional torts such as retaliatory discharge, punitive damages are likewise appropriate under statutes penalizing retaliatory discharge. *Perez v. Jasper Trading, Inc.*, 2007 WL 4441062 (E.D.N.Y. 2007) (citations omitted).

140.   In light of the willful, wanton and malicious nature of Defendants' conduct as aforesaid, and the substantial public interest in deterring and punishing such reprehensible conduct, punitive damages should be imposed against Defendants in an amount estimated to be not less than $1,000,000, and which in any event should be in an amount sufficient to punish Defendants and to

deter Defendants and other employers from engaging in similar misconduct in the future.

## SEVENTH CAUSE OF ACTION
(Against Defendants Reina Bijoux, Inc.,
Bijoux World, Inc., Jieun Youn and Inhee Park)

### UNLAWFUL RETALIATION IN VIOLATION OF
### THE NEW YORK LABOR LAW § 215

141.   Plaintiff incorporates paragraphs 1 - 139 by reference as if fully set forth herein.

142.   NYLL § 215 makes it unlawful for any employer to penalize or in any other manner discriminate or retaliate against any employee because such employee has filed a complaint alleging that the employer has violated any provision of the New York Labor Law.

143.   Defendants filed the above-referenced baseless Counterclaims against Plaintiff to retaliate against Plaintiff for filing a lawsuit seeking unpaid overtime and challenging Defendants' unlawful requirement that Koreans perform extra work as a "courtesy" without being paid overtime (a practice that violates, *inter alia*, New York Labor Law §§ 653 and 655, which authorized the Commissioner of the New York Department of Labor to promulgate the overtime pay requirements contained in the Miscellaneous Wage Order codified at section 142.2.2 of Title 12 of New York's Codes Rules and Regulations and New York

31

Labor Law § 663, which authorizes the civil actions to enforce those overtime provisions).

144.   Defendants' retaliatory conduct as aforesaid is likely to deter a person from engaging in protected activity.

145.   As a result of Defendant's retaliatory Counterclaims accusing Plaintiff of immoral and illegal behavior and demanding punitive damages against Plaintiff, Plaintiff has suffered harm to her reputation (business and personal) in, *inter alia*, the relatively tight-knit Korean-American community in Manhattan, and has experienced stress, intimidation, anxiety and physical and emotional discomfort, and will incur legal costs as well as needless delay in vindicating her legal rights.

146.   For violating NYLL § 215, Defendants are liable for such relief as may be appropriate to effectuate the purposes of § 215, including, without limitation, damages for diminished employment prospects, non-pecuniary damages and attorney's fees.

147.   In light of the willful, wanton and malicious nature of Defendants' conduct as aforesaid, and the substantial public interest in deterring and punishing such reprehensible conduct, punitive damages should be imposed against Defendants in an amount estimated to be not less than $1,000,000, and which in any event should be in an amount sufficient to punish Defendants and to

deter Defendants and other employers from engaging in similar misconduct in the future.

## EIGHTH CAUSE OF ACTION

## UNLAWFUL RETALIATION IN VIOLATION OF THE NYCHRL § 8-107

148.   Plaintiff incorporates paragraphs 1 - 139 by reference as if fully set forth herein.

149.   The New York City Human Rights Law, (New York City, N.Y., Code § 8-107, New York City), provides, in pertinent part:

> 7. Retaliation. It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, [or] *** (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter. The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment … or in a materially adverse change in the terms and conditions of employment, …provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity.

150.   Defendants filed the above-referenced baseless Counterclaims against Plaintiff to retaliate against Plaintiff for filing a lawsuit challenging

Defendants' unlawful requirement that Koreans perform extra work as a "courtesy" without compensation.

151.   Defendants' retaliatory conduct as aforesaid is reasonably likely to deter a person from engaging in protected activity.

152.   As a result of Defendant's retaliatory Counterclaims accusing Plaintiff of immoral and illegal behavior and demanding punitive damages against Plaintiff, Plaintiff has suffered harm to her reputation (business and personal) in, *inter alia*, the relatively tight-knit Korean-American community in Manhattan, and has experienced stress, intimidation, anxiety and physical and emotional discomfort, and will incur legal costs as well as needless delay in vindicating her legal rights.

153.   For violating NYCHRL § 8-107, Defendants are liable for such relief as may be appropriate to effectuate the purposes of § 8-107, including, without limitation, damages for diminished employment prospects, non-pecuniary damages and attorney's fees.

154.   In light of the willful, wanton and malicious nature of Defendants' conduct as aforesaid, and the substantial public interest in deterring and punishing such reprehensible conduct, punitive damages should be imposed against Defendants in an amount estimated to be not less than $1,000,000, and which in any event should be in an amount sufficient to punish Defendants and to

34

deter Defendants and other employers from engaging in similar misconduct in the

future.

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

(A)     On her first cause of action, in an amount to be determined at
        trial, but which is estimated to be not less than $1 million in
        compensatory damages and not less than $1 million in punitive
        damages, together with statutorily authorized attorney's fees;

(B)     On her second cause of action, in an amount to be determined at
        trial, but which is estimated to be not less than $1 million in
        compensatory damages and not less than $1 million in punitive
        damages, together with statutorily authorized attorney's fees;

(C)     On her third cause of action, in an amount to be determined at
        trial, but which is estimated to be not less than $1 million in
        compensatory damages and not less than $1 million in punitive
        damages, together with statutorily authorized attorney's fees;

(D)     On her fourth cause of action, in an amount to be determined at
        trial, but which is estimated to be not less than $1 million in
        compensatory damages and not less than $1 million in punitive
        damages, together with statutorily authorized attorney's fees;

(E)     On her fifth cause of action, in an amount to be determined at
        trial, but which is estimated to be not less than $13,000 in
        compensatory damages, together with statutorily authorized
        attorney's fees;

(F)     On her sixth cause of action, in an amount to be determined at
        trial, and not less than $1 million in punitive damages, together
        with statutorily authorized attorney's fees;

(G)     On her seventh cause of action, in an amount to be determined
        at trial, and not less than $1 million in punitive damages,
        together with statutorily authorized attorney's fees;

(H)     On her eighth cause of action, in an amount to be determined at

trial, and not less than $1 million in punitive damages, together with statutorily authorized attorney's fees; and

(I)     Such other and further relief as is just.

**JURY TRIAL DEMANDED:** Plaintiff demands a trial by jury of all

issues so triable.

Dated:      New York, New York
            November 23, 2011

                              LAW OFFICES OF SCOTT A. LUCAS,

By_____
      Scott A. Lucas (SL-6316)
      250 Park Avenue
      20th Floor
      New York, New York 10177
      (212) 983-6000
      *Attorneys for Plaintiff Hyunmi Son*

36

# EXHIBIT A

ASTA-USA

**ASTA-USA TRANSLATION SERVICES, INC.**
POST OFFICE BOX 25, MAIN STREET | HARTVILLE, WYOMING 82215 USA
TEL.: 866.446.1860 | FAX.: 866.297.0606 | WWW.ASTA-USA.COM | WWW.LEGALTRANSLATIONSOLUTIONS.COM

# CERTIFIED TRANSLATION

*Documents Translated For:*

| LAST NAME: Lucas | FIRST NAME: Scott | MIDDLE NAME: |
|---|---|---|
| COMPANY: Law Offices of Scott A. Lucas | DIVISION: N/A | |

*List of Materials, Documents, Forms, Transcripts, Licenses, etc., translated.*

Audio file name: 20110126 Tony & Brenda | Length: 10 min. + 3 sec.

| Source Language: | Korean |
|---|---|
| Target Languages: | English |

## SAN DIEGO, CALIFORNIA

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at ASTA-USA Translation Services, Inc., a professional document translation company, attest that the language transcription and translation completed by ASTA-USA's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the transcription and translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, ASTA-USA Translation Services, Incorporated has caused the Certificate to be signed by its duly authorized officer(s).

**By:**

**Date:** March 2, 2011

Alain J Roy, President

A copy of the translated version is attached to this statement of certification.



The National Association of
Judiciary Interpreters & Translators

ASTA-USA Translation Services, Incorporated – Member #7031
*A Member in Good Standing*



**Audio file name: 20110126 Tony & Brenda**
**Total length of tape: 10 min + 3 sec.**

*(...) indicates a pause in speech, an unfinished sentence, a trailing off into silence

| Speaker | Transcription (Korean) | Translation (English) |
|---|---|---|
| | (Footsteps | |
| | (Door closing) (More footsteps) | |
| Man | 아~ 지금까지 왔다 갔다 뭐 서로 고생도 많이 했고, 했는데, 트라이 해보니까 아닌 것 같고 | Ah~ we both had trouble going back & forth. We tried. It does not seem to be working. |
| | (Door opening) | |
| Woman | 뭐 하는 거에요? | What are you trying to say? |
| Man | 어허 | Uh~ |
| Woman | 저 지금 짜르시는 거에요? | Are you firing me now? |
| Man | 어허 | Uh~ |
| Woman | 솔직히 얘기하셔도 되요 | Please be upfront with me. |
| Man | 어 어 (중얼거림). 어제 얘기한 거... | Uh, Uh, (mumbling). What I said yesterday... |
| Woman | 얘기하셨어요 이사님한테? | Did you talk to General Manager? |
| Man | 어 (중얼거림) 여러가지 안맞는게 (해독불가) | Uh (mumbling). Many things we are not in accord (incomprehensible) |
| Woman | 그럼 저 지금 뭐지 토요일 날 안나오는 것 때문에 짤리는 게 공이크네요. | That is, I am being fired mainly because I don't want to work on Saturdays, right? |
| Man | 토요일은... | Saturdays... |
| Woman | 물론이고... | As well as... |
| Man | 토요일은... 그건거는 진짜로 회사 전부다가 똑 같은 마음으로 움직여야 되는 상황인데. 똑 같은 마음으로 진짜로 움직여야 하는 상황인데, 그게 만일에 안된다면 그게 안된다면 제일 힘든 케이스 (해독불가) 솔직히 말해서... | Saturdays...That is something the whole company must act in unison. That is something we must be really in unison. If that is not something you cannot do, if you cannot do, that is gonna be difficult (incomprehensible). To be honest with you... |
| Woman | 제가 토요일 일하는 것 때문에 짤리는 거네요. 아니면 다른 또 이유가 또 있나요? | I take is as I am being fired because I don't want to work on Saturdays. Are there other reasons? |
| Man | 아니 뭐, 다른 거야, 특별히 잘못한게 뭐가 있어. 잘못한게. 근데, 충돌이 좀 있었잖아. 베케이션라든지...이런 것들, 이런 것들... | No, there is nothing else really. You did not do anything wrong. But there was a conflict you know. Thinks like the vacation matter... something like that. |
| Woman | 그게 충돌이에요? | You call it a conflict? |

| Man | 그거는 뭐 이제... | That is, uh~ now... |
| Woman | 많이 혜택을 봐줬다 이거죠? | You are saying, you have let me get away with it many times, right? |
| Man | 뭐 그렇지 뭐 그런건데 세터데이 일 케이스 같은 거는... | Well, uh~ that is what is. But about working on Saturdays... |
| Woman | 그런데 저는 먼데이에서 금요일까지 일하기로 와서, 토요일 일하는 것도 좋아요. 그런데 토요일 일하는 거에서 오버타임 얘기하는게, 그렇게 회사를 그만두어야 될 만큼의 이유가 되는건가요? | As for me, originally scheduled to work from Monday to Friday, working on Saturdays is fine. Is talking about overtime pay for working Saturday a reason serious enough to quit? |
| Man | 이게, 어, 그게 만일에 안되면은, 그게 만일 안되면은, 왜냐하면 다른 친구들이 많아. 다른 친구들이 다른 친구들이 이 회사에 (해독불가) 그 때에 우리 회사가 이렇게 이머전시 경우에 참여해서 같이 해야 된다. 응, 보면은 세일즈맨들이나 이런 사람들 토요일 일요일 개념 없잖아. | That is, uh~, if that is not possible, if that is not possible, that is because there are a lot people. A lot of people, a lot of people at this company (incomprehensible). On such occasions, our company like this, we should participate all together. You see, sales people or people like them don't distinguish Saturday or Sunday. |
| Woman | 세일즈 퍼슨들은 혜택을 거의 받잖아요 저희들에 비해서. 저희가 받지 제가 받지 않는 부분들 저 하나 뿐 만 아니라 다른 사람들도 여러 사람 그렇게 있는데, 제 생각에는 (해독불가) 부장님이 (해독불가) 그 부분을 설득해갔다고 해줘야 되는게 아니었을까 싶어요. | Sales persons receive most benefits. They are not like us. I am not the only one who does not receive the benefits. There are a lot people. In my opinion (incomprehensible), you are the one who should talk to (incomprehensible) so that we also receive the benefits. |
| Man | 오 그 부분은 그 부분은 뭐야 내가 나는 내가 매니저지만 내가 고용주 마인드로 움직이는 뭐 그 부분이 뭐 대해서는 그런 부분에 대해서는 이 업계에서 이 회사에서 그런식으로 움직이는데 사실 그게 자기랑 안맞다면...이런 경우 내가 많이 겪었어. 솔직히 말해서... | Oh, that is, though I am the manager, that is something to be decided by a person with owner's mind. Speaking of it, in this industry, this company works that way. If that is something you cannot accept...I have seen my cases like this. To be honest with you... |
| Woman | 당연히 많았겠죠. 당연히 오버타임 안하는데가 어디 있겠어요. | I am sure you have. There is no workplace where they don't pay overtime. |
| Man | 솔직히... | To be honest with you... |
| Woman | 식당에서도 다 쳐주는데. | Even restaurants pay overtime. |
| Man | 솔직히 많이 겪었는데...그래서 한국사람들과 많이 일하는 거구. 한국 | I have seen many cases like this to tell you the truth...that is why we work with Koreans. Koreans... |

| | 사람들은… | |
|---|---|---|
| Woman | 오버타임 안받아도 암말 안해요? | Don't they complain even if they don't get paid overtime? |
| Man | 한국사람들은 이런 예의에 대해서 서로 이해를 하고 하는 사람들이 (해독불가) | Koreans understand each about this kind of courtesy (incomprehensible) |
| Woman | 예의를 안지키면은… | If they are not courteous… |
| Man | 아닌 이런 예의가… | What I am saying is an exception… |
| Woman | 예외? | An exception? |
| Man | 예외가 있는데, 이런거는 쇼 때도 그럴 수 있고, 그런 경우가 많이 있었기 때문에… | There are exceptions. Like when we have a show. Because there are many occasions like this… |
| Woman | 저 그럼 이번 저 금요일까지만 하고 갈께요. | I will work until this Friday and quit. |
| Man | 안따같게 생각하고 그 부분에 대해서 나는 뭐 솔직히 굉장히 처음부터 뭐 지금까지 뭐 굉장히 같이 가고 싶었던 사람… | It is unfortunate that it happened. Frankly, I really wished from the beginning that we work together for a long time… |
| Woman | 저도 마찬가지에요. 저도 뭐 매니저님 뭐 초창기 때 그런 생각과 되게 많이 통하는게 많았고 했는데, 이 회사는 너무 바라는 게 많더라구요. 사실 솔직히 그래요. 돈 쪼금 줘도 그 위 사람과 분위기가 좋으면, 애들 목숨 내놓고 하잖아요, 한국사람들. 그 정에. 근데 그런 분위기 안만들어 주잖아요. 항상 디스커리지 할 거를 찾아내고. 오케이 알겠어요. 부장님하고 이사님하고도 저 얘기를 좀 해야겠어요. | Same here. In the beginning, I thought we had a lot in common but I began to realize the company was expecting too much in return. As for me, you know I would not mind working for less money as long as I have good superiors. You know we Koreans can be awfully loyal to the company no matter what for the sake of the good relationship. But this company does not create such environment. They are always looking for something to discourage employees. Okay, I understand. I need to talk to the General Manager too. |
| Man | 음~ | Um~ |
| Woman | 짤려도 이사님한테 짤려야죠. | I want to let her officially fire me if I am going to be fired after all. |
| Man | (웃음) | (Strained laugh) |
| Woman | 괜찮아요. | It is okay. |
| Man | (해독불가) (억지웃음) 아주 힘든 얘기가 됐고 (해독불가) 그런 상황이 되고 있는데, 된 거 같애. 지금으로서는 지금으로서는. 뭐~ 뭐~ 이에 뭐 짤렸다 안짤렸다를 떠나서, 짤렸다 안짤렸다를 떠나서… | (Incomprehensible) (strained laugh) Situation has become difficult (incomprehensible). It is going into such direction. It seems that way. For now, for now, uhm~ uhm~ it is not something you are fired or not. Beyond being fired or not… |
| Woman | 짤린거죠. | I am fired. |
| Man | 지금 이 길을 다 같이 가자 하는데 그런데 참여가 안되는 상황이기 때문에…라는 거지. | We are all expected to take this road together but you are not with us…that is what it is. I don't know what to call it. Anyway (phone ring) (incomprehensible). Talk to the General |

| | | |
|---|---|---|
| | 이 걸 뭐 뭐라고 표현하기도 그렇고. 아무튼 뭐 (전화소리) (해독불가) 이사님하고 얘기를 디테일하게... (전화소리) (해독불가) | Manager in detail...(phone ring) (incomprehensible) |
| Woman | (해독불가) 나가나요? | (Incomprehensible) going out? |
| Man | 아니 (해독불가) | No (incomprehensible) |
| Woman | 아! | Ah! |
| Man | (중얼거림) | (Mumbling) |
| Woman | 저, 이사님좀 불러주세요. 얘기좀 하게. | Will you please call General Manager for me. I want to talk. |
| | (Paper flipping) (Footsteps) (Door closing) | |
| Woman | 저 부장님한테 말씀드렸는데 저 토요일 일안하게 되서 짤리게 된건가요? | I talked to the manager already. So, am I being fired because I don't want to work on Saturdays? |
| | (Silence) | |
| Woman | 저 편하게 말씀하셔도 되요. | You may be upfront with me. |
| Woman 2 | 그 것 때문에 그런거는 아니고요. 토요일 일하는거 모두가 원하는거는 아니죠. 회사에서 이렇게 해야된다고 그랬을 때 못하신다고 하셨다고... | That is not exactly the reason. Not everyone wants to work on Saturdays. I understand you said no when the company said you should... |
| Woman | 네, 오버타임 안주신다고 해서요. 오버타임 없는거에요. | Yes, that is because I was told there was no overtime pay. Is that true? |
| Woman 2 | 네 모두가. | Yes, no one. |
| Woman | 왜요? | Why not? |
| Woman 2 | 음~ | Um~ |
| Woman | 주급제라서요? | Is it because we get paid weekly? |
| Woman 2 | 어? | Uh? |
| Woman | 주급 주시니까? | Is it because we get paid weekly? |
| Woman 2 | 이건 이 일에 오버타임이라고 미국식으로 딱 잘라서 말한다면 정말 미국회사가 맞는거겠죠. 저희 한국회사는 그런게 아니... | If you clearly say it is overtime in the U.S. style, then the company would be a U.S. company. But we Korean company does not really... |
| Woman | 그런데 여기는 미국에 있는 회사니까...그런데 솔직히 그래요. 그러니까 솔직히 말해서 미국에 있는 회사잖아요, 이것두. 미국회사는 아니지만. 그럼 미국에 있는 법을 따라야 되잖아요. 오버타임은 솔직히 레스토랑에서도 주잖아요. 저도 | But this company is located in the U.S...To be honest with you. To make it clear, this company is located in the U.S. This company, though not a U.S. company, must follow U.S. law. You see, even restaurants pay overtime. It is fine with me if you don't pay. But it kind of bothers me when the company refuses to provide the very basics. |

| | | |
|---|---|---|
| | 솔직히 안받아도 되요. 그런데 그거는 기본적인것에 대해서 안해 주신다고 한거가 솔직히 좀 이해가 안되거든요. | |
| Woman 2 | 그래서 저희가 다 한국사람을 뽑는거구. 그리고 저희가 면접볼 때도...저랑 면접을 전혀 안보셨잖아요. 저희 면접볼 때도 모든 사람들에게 말씀 드려요. | That is why we hire Koreans. When we conduct interviews…you did not have an interview with me. We tell everybody at the interview. |
| Woman | 오버타임 안준다고? | The company does not pay overtime? |
| Woman 2 | 아니, 토요일 날...원래는 월요일 금요일 근무지만 바쁠 때는 쇼 준비 토요일 나와야 된다. 그런건 추가적으로 없다. 그런거 다 말씀드리고 하는데... | No, on Saturdays…regular hours are Monday through Friday, but when busy, employees should come to work to prepare a show. There is no additional pay. We tell them about it… |
| Woman | 저 월요일 금요일까지 일하고 토요일 안나오니까 짤리네 (웃음) | So, I am being fired because I work Monday through Friday but not on Saturday (strained laugh) |
| Woman 2 | (헛웃음) | (Strained laugh) |
| Woman | 그러 말고는 또 이유가 없나요? 제가 짤리는 이유는? | Is there another reason other than that? The reason I am being fired? |
| | (Silence) | |
| Woman | 그리고, 제가 체크를 계속 받았었잖아요. 아무튼 제가 텍스로 삼천불을 더 내게 됐어요. 그래서 이번에 보니깐, 일월달까지 하면 제가 6개월 체크를 받는거더라구요. 여섯달을...그럼 제가 나중에...일단 뭐...저 지금 금요일까지 일한다고 말씀 드렸거든요. 그리고 경혜씨는 거의다 할 수 있게끔 해놨으니까 하면 되고. 제가 실업급여를 신청할 거에요. 그럼, 회사에서는 이사님이 나중에 싸인만 하시면 되요. 준거는 없고 제가 얼마 받을지도 몰라요. 한 번 해볼거에요 저도. 그것만 나중에 해주시면 되고. 오버타임 나중에 주세요, 이사님. 식당들도 쥐요. 유에스 주얼리도 주고. 안타깝잖아요. 다른 사람들이...이사님이 뭐 다른 것 아끼시고 다른 것 힘드시겠지만... | And, you know I have received the checks so far. Anyway I am supposed to pay additional $30,000 in taxes. I found that I will have received checks for the last 6 months if I continue to work until the end of January. For six months…If do…I told him that I will work until Friday. And, I arranged everything so that Kyunghae will take over. I am going to apply for unemployment benefit. All you need to is to sign the paperwork later. I have not paid much. Not sure how much I will be paid. I will try it anyway. If you only could take care of it. Please pay overtime later. Even restaurants pay overtime. So does U.S. Jewelry. It is something we deserve. Other people…I know you need to save money, and have other things to take care of. |
| Woman 2 | (해독불가) 알겠습니다. | (Incomprehensible) Okay. |
| Woman | (해독불가) 챙겨 주시고. 금요일까지...가겠습니다. | (Incomprehensible) Please take care of it. Until Friday…I am leaving then. |

| | | |
|---|---|---|
| | (Footsteps) | |
| | (End of tape) | |